WILSON et al. v. THOMPSON. (No. 566.)

(Court of Civil Appeals of Texas. El Paso. May 11, 1916. Rehearing Denied May 25, 1916.)

1. TRIAL ⬗352(4) — ISSUES — PLEADING AND PROOF.

Plaintiff held a note against one J., for $100, and J. gave a note for a like amount signed by C. as principal and by McC. and W. as sureties, and himself indorsed the note in blank, which, when due, was renewed by note signed by McC. and W. only. In an action thereon defendants, following their pleadings, requested submission of issues as to whether plaintiff accepted the note in full payment of the debt from J., as to whether plaintiff accepted the renewal note as the note of J., with McC. and W. as sureties, in place of the original debt, and as to whether plaintiff represented that J. was the principal and the indorsers sureties, but the court submitted only the issue as to whether the first note was accepted by plaintiff in payment of the indebtedness, to which the jury returned an affirmative answer. *Held*, that the issue submitted did not include the defense pleaded and proven, and that its failure to do so was reversible error, so that the finding would not support a judgment for plaintiff.

[Ed. Note.—For other cases, see Trial, Dec. Dig. ⬗352(4).]

2. BILLS AND NOTES ⬗242 — LIABILITY — SURETIES OR PRINCIPAL.

Under an agreement whereby the indorsers of a note renewed it without the maker's signature to the renewal note, they would not be sureties, but principals, in the renewal note; and an indorser on a note, without an agreement fixing his liability, would be a surety, and, on its renewal, without the signature of the maker, would become a principal.

[Ed. Note.—For other cases, see Bills and Notes, Cent. Dig. §§ 542, 547, 548, 550, 551; Dec. Dig. ⬗242.]

3. EVIDENCE ⬗340(4) — DOCUMENTARY EVIDENCE.

In such action, it was error to admit as evidence the bond on appeal from the justice court, as it tended to prove no issue in the case.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 1298; Dec. Dig. ⬗340(4).]

Appeal from Scurry County Court; C. R. Buchanan, Judge.

Action by W. T. Thompson against J. F. Wilson and others. Judgment for plaintiff, and defendants appeal. Reversed and remanded.

Smith & Spiller, of Snyder, for appellants. Rosser & Boyd, of Snyder, for appellee.

WALTHALL, J. In 1908, appellee, W. T. Thompson, held a note against T. J. Jackson for $100, and with some interest due, secured by a chattel mortgage on Jackson's team of horses. At the same time Jackson held a note for a like amount signed by H. A. Carter as principal, and appellants W. R. McClanahan and J. F. Wilson as sureties. Jackson gave Thompson the Carter note in exchange for the note Thompson held against him and indorsed the Carter note in blank, but leaving some interest on his note to Thompson still unpaid. When the Carter note became due, with Thompson's consent, a new note was given, signed by Jackson, McClanahan, and Wilson. When that note became due, it was renewed by Jackson, McClanahan, and Wilson and the parties signing in the order stated. When this last note became due, Thompson again agreed to a renewal. Another note was prepared by Curnutte, cashier of the First National Bank of Snyder, Tex., where the note was payable and where Thompson left his papers. This last note was signed by McClanahan and Wilson, Jackson not signing. There is some controversy in the evidence as to Jackson not signing this last note, the one on which this suit was brought. The renewal notes were made payable to Thompson.

Wilson testified as a witness, and, after identifying the Carter note and the renewal notes, said:

"That note was made in renewal of a note of H. A. Carter which we were surety men on. Yes; that is the Carter note (the note payable to T. A. Jackson, signed H. A. Carter, W. R. McClanahan, and J. F. Wilson). When this note of Carter's was made it was turned over by Jackson who owed Thompson, to Thompson, and when it came due Thompson notified us that we come in and renew the note or make a new one. Carter was gone then. I don't know where he was; he had gone some time. We came in town and went out to Mr. Thompson's place south of town and found him in the field working. McClanahan and Dee McClanahan went with me. We talked the matter over with Thompson and he told us to go to the First National Bank and he would phone Curnutte, who was the cashier of the bank, to make a new note and have Jackson and us sign it. He told us we would find Jackson up town somewhere and to get him to sign the note. We went back to the bank and Curnutte fixed up a new note, and when we went to sign it he said, 'Jackson is the first man on this note; you must get him.' So Mr. McClanahan went out and got Mr. Jackson and he came in and signed the note. * * * When this note came due we were again notified and came in and made another note signed by Jackson and us two just as in case of the other note. * * * When that came due we were notified and came in the bank and made another note. This one that is sued on, which we understood was a renewal note, and which was such renewal—Jackson was not there, but we signed up just as we always had signed as surety men only and we understood that Jackson was to sign the note; that the note was just like it had been before. I never knew anything about the change in the note until not long before we were sued, and then when I found out that Jackson had not gotten on the note, I refused to pay it, as it was his note and we were only surety men; no, sir, I never agreed in any way that Jackson should be released and wouldn't have signed the note sued on if I had known Jackson was not to be on it. I never owed Thompson anything; it wasn't my debt, and when he released Jackson without my consent, I didn't propose to pay the note. * * *

I and Mr. McClanahan were surety men for Carter to Jackson, and then when that note was renewed and Carter was left off, McClanahan and I were surety men for Jackson. * * * When this note sued on was signed, we were up there in the bank; I think maybe Mr. Thompson was present then. I don't know that anything was said about Jackson signing it, but we understood the note was to be the same as the old one. No; Carter did not sign the note renewing the old Carter note."

T. A. Jackson testified:

"The note now being sued upon is a renewal note of one signed by myself and these two defendants, which note was a renewal of a similar note, and that one had been given to Thompson in place of a note which I had transferred to Thompson, which note was made by Carter and these two men payable to me. I had some dealings with Mr. Thompson and owed him $100 to secure which he held a mortgage on my team. I turned him over this note of Carter's and I thought he released me from the old debt. Yes; he afterwards dunned me for the Carter note and also for these two other notes; he would always do it in a nice way, saying to me, 'What are you fellows going to do about that note?' and I would tell him I could not do anything, but would see the others; then we would renew the note. The last time the note was renewed I was left off. Mr. Thompson came to my place in Hermleigh where I was at, and told me I need not sign that note, and that there wasn't any need of my signing those other notes. * * * Yes; I thought he released me from the old debt, but when he dunned me I thought otherwise. Yes; I signed the first note after the Carter note, and then a renewal of that one. When the first note was made Mr. McClanahan came down to the Higginbotham-Harris Lumber Yard where I was working and told me to come up and make the note. I did not think I ought to go on the note, but Mr. Curnutte said, 'You are the first man on the note and must sign it,' which I did and then afterwards renewed the note. When I turned the note over to Mr. Thompson I indorsed it. Yes; indorsed it in blank. That is my signature (inspecting note submitted). Yes; he released me from the last note. Yes; I am sure he dunned me for the note. I owed Mr. Thompson a $100 note and some accrued interest, and he held a mortgage against my team to secure it. I had this note against Mr. Carter, McClanahan, and Wilson for $100 and I indorsed it over to Thompson, and my understanding was that that settled the note I owed Thompson. Thompson was to release my team from his mortgage. I do not remember whether he turned my note over to me or not. He has never claimed the team and has never attempted to foreclose the mortgage. No; at the time I turned the Carter note over to Thompson it did not pay the accrued interest on my note to him, but I agreed to pay that as soon as convenient. It was small account. No; Thompson has never dunned me on the original note that I owed him. He has dunned me on the Carter, McClanahan, and Wilson note that I indorsed over to him and he has dunned me on the two renewal notes I executed with McClanahan and Wilson. Yes; I met up with Thompson in Hermleigh one day and something was said about the note, and he told me that I need not have signed the two renewal notes which I signed. * * * No; I have never paid Thompson all the interest I owed him on my note to him."

McClanahan testified substantially as did Wilson as to the renewal notes and said:

"I don't remember which one it was, but he [Thompson] told me to get Jackson on that note. Yes; I remember going down to the lumber yard to find Jackson. Mr. Curnutte sent me. He said that Jackson had to sign this note; that he was the first man on it."

Thompson testified substantially as did Jackson as to the Carter note and as to the unpaid interest on the Carter note, and substantially as did McClanahan and Wilson on their visit to him in his field and said:

"They [McClanahan and Wilson] said Carter was away somewhere in another county, I do not remember what one. I agreed to take their note and told them to go up to see Curnutte at the bank and I would phone him to fix up a new note for them to sign. They left and soon after I went to the house and phoned Curnutte at the bank. Nothing was said about Jackson during the conversation. * * * On the occasion I met Jackson in Hermleigh, after the last note was executed, and in our conversation I told him there was no necessity for his signing the note, and he had just let those fellows fool him into signing the two notes he had signed. I never looked to Jackson for the money. When I took the note he indorsed to me I released him from his debt to me. I have asked him several times for the interest he owes me. * * * I found out afterwards that he was on the note and let him stay on the note and on the renewal note. Yes; he was on the two notes altogether for two years or more, and I never objected to his being on them. I authorized Curnutte to make a new note; I suppose I made him my agent for that purpose. I just told him to renew the note. No; we never expected Carter to sign the note."

Curnutte testified:

"Yes; the indorsement, 'New note made to W. T. Thompson by Jackson, McClanahan and Wilson, Feb. 4, 1909,' was placed on the back of the note dated July 1, 1908, by me. I remember in a general way about taking these renewal notes, but nothing definite. Mr. Thompson kept his papers in the bank at that time. Yes; when I have instructions about drawing papers, I draw them according to instructions. No; I don't know who wanted Jackson on the note, or who went and got him. * * * Well, I might make a note in renewal of another without including the indorser. It would depend upon the instructions I had. I do not think I would leave the indorser out of a renewal note unless I had instruction to do so."

The case was submitted to the jury on special issues.

[1, 2] Appellants requested the court to submit the following issues:

"(1) Did W. T. Thompson accept the note made on the 1st day of July, 1908, and executed by Carter, McClanahan, and Wilson payable to T. A. Jackson, and indorsed by Jackson to Thompson, in full payment for the debt at that time owing by Jackson to Thompson, and release Jackson from the payment of that debt?

"(2) Did W. T. Thompson accept the note dated on the 4th day of February, 1909, in renewal of the Carter note, as the note of Jackson, with McClanahan and Wilson as sureties, in place of the original debt of Jackson to Thompson?

"(3) Did Thompson represent that Jackson was principal and these defendants sureties, and did the three of them agree to that, and act upon it?"

The trial judge submitted to the jury but one issue, as follows:

"The note of the principal sum of $100 is dated July 1, 1908, was executed by H. A. Carter, as principal, and J. F. Wilson and W. R. McClanahan as sureties, and was payable to T. A. Jackson. When Jackson turned this note over to W. T. Thompson, did Thompson accept it as payment for $100 of indebtedness that Jackson owed Thompson at the time the note was delivered to Thompson?"

To which the jury answered:

"Yes. Rem. With T. A. Jackson indorsement on same."

On the verdict of the jury, the court entered judgment for appellee against appellants for $208.60, interest from date of judgment and costs.

Appellants in their answer had pleaded that Jackson was the principal on the renewal notes, and that they were sureties; that at the time of the execution of the last renewal note sued upon appellee secured their signatures by representing to them that he would secure the signature of the principal, Jackson, and that it was the distinct understanding that Jackson was to sign the note as principal as he had theretofore done in the previous renewal notes; that appellee had failed to secure the signature of Jackson and had released him from any further liability thereon.

Appellants complain of the action of the court in not submitting to the jury all of the issues made by the pleadings and the evidence, bearing upon the question of the liability of appellants on the note sued on.

Without considering the several assignments separately, the contention of appellants is that the one issue submitted by the court did not submit all of the issues made by the pleadings and evidence, and that the one issue submitted and decided by the jury was not a sufficient settlement of the issues upon which to render judgment. Suppose it should be an admitted fact that Thompson, as between himself and Jackson, did accept the Carter note as payment for the $100 indebtedness of Jackson, and that as between Thompson and Jackson the indorsement in blank on the note by Jackson was intended only to pass the ownership of the note from Jackson to Thompson, and was not intended to strengthen the security of Thompson by becoming a surety on the note with McClanahan and Wilson, the admission of that one fact does not determine the issue pleaded by appellants that in the execution of the renewal notes "that it was the distinct understanding by and between the plaintiff (appellee) and these defendants (appellants) that said Jackson was to sign this note (the one sued on) as principal, as he had heretofore done in the renewal notes" as pleaded by appellants, and as denied by appellee in his supplemental petition "that in fact no such contract or agreement was ever made by this plaintiff, thus putting in issue the question as to whether, by agreement between appellants and appellee, Jackson was to sign the renewal notes as a substitute principal. It seems to us that the position Jackson was to fill on the renewal notes is the principal question in the case. The facts are not disputed that Jackson had signed the former renewal notes and had signed first on the note, and that appellants had understood

from the alleged agreement that he was signing as principal. If Jackson, by agreement, was to sign the note sued on, in whatever relation he was to sign, and if appellants so understood it when they signed the note, and if appellee, after they had signed the note, released Jackson from the agreement and accepted the note without Jackson's signature, the note sued on would be without the agreement. By the agreement of McClanahan and Wilson to renew the Carter note without Carter's signing same, McClanahan and Wilson would not be sureties, but principals, in the renewal notes. Jackson's indorsement on the Carter note, in the absence of an agreement fixing the character of his liability, would not make him a principal on the Carter note, but he would then be a surety, and by the renewal of the Carter note, he would, we think, stand in his new relation to Thompson, the same as McClanahan and Wilson—all principals—by reason of their agreement to release Carter in the making of the renewal note; that is, he would not necessarily be the principal, in the absence of an agreement that he should be, and McClanahan and Wilson could not have a judgment over and against him as the principal on the renewal note. If such were the rule, Jackson would get nothing for his Carter note, as he would in the end have to pay the whole of the renewal note. The issue submitted to the jury did not embrace the defense made by appellants, both by pleading and proof, and we think the failure to do so is reversible error. We are of the opinion that the finding of the jury on the one fact submitted was not only not sufficient to support the judgment, but was not a submission of the principal issues raised by the pleadings and proof.

[3] In view of another trial, we will add that it was error to admit as evidence the bond on appeal from the justice court. It tended to prove no issue in the case. We think we need not comment on the form of the verdict, as it is not likely that the answer in that or a similar form will again occur.

For the reasons given, the case is reversed and remanded.